UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

Jenner & Block LLP,

   Plaintiff,

     v.

The Republic of Sierra Leone,

   Defendant.

Civil Action No. _____

---

# COMPLAINT

Plaintiff Jenner & Block LLP ("Jenner & Block"), as and for its complaint against Defendant the Republic of Sierra Leone ("Sierra Leone" or the "Republic"), alleges:

## Nature of the Action

1. This is an action to recover more than $8 million in past-due legal fees. Between December 2019 and October 2021, Jenner & Block vigorously represented Sierra Leone in four different forums defending claims by an iron ore concessionaire that sought more than $1.8 billion. Jenner & Block succeeded tremendously—the concessionaire's claims were resolved by settlement with no payment by the Republic and highly favorable non-monetary terms. To achieve that remarkable result against an unusually aggressive opponent represented by able counsel, Jenner & Block incurred more than $11.7 million in fees. However, Sierra Leone has only paid Jenner & Block $3.6 million, leaving more than $8 million owed. Authorized representatives of the Republic have repeatedly expressed their satisfaction with Jenner & Block's work and the resolution of the dispute, acknowledged the Republic's debt to Jenner & Block, and even worked to facilitate payment by the Republic. No representative of Sierra Leone has at any point criticized

Jenner & Block's work or denied that the Republic owes Jenner & Block additional fees. But Jenner & Block has not been paid for more than a year.

2. This lawsuit is thus regrettably necessary because, despite the acknowledged debt and efforts to pay it, the Republic has simply failed to act for over a year. Payment requires approval by Sierra Leone's Cabinet which, despite repeated assurances from the politicians and officials who actually dealt with Jenner & Block, has failed to act in response to Jenner & Block's repeated requests to pay made through the Republic's authorized representatives over the past year. Consequently, although Jenner & Block highly values its relationship with the Republic, the firm most reluctantly commenced this action to recover the sums it is owed.

Parties

3. Jenner & Block is a law firm with six offices across the United States and in London, England, and operates as a professional service limited liability partnership, organized and existing under the laws of the State of Illinois. Jenner & Block has an office in the District of Columbia and does business on a regular and substantial basis in the District of Columbia, has an office at 1099 New York Avenue, NW Suite 900, Washington, DC, and Jenner & Block lawyers regularly appear before courts, agencies, and Congress in the District of Columbia.

4. The Republic of Sierra Leone is a foreign nation with an Embassy located at 1701 18th Street NW, Washington, DC.

Jurisdiction And Venue

5. This Court has subject-matter jurisdiction over the claims asserted against Sierra Leone under 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state."

6. As alleged in more detail below, in its written contract with Jenner & Block that forms the basis for certain of the firm's claims and attached hereto as Exhibit A, Sierra Leone waived any otherwise applicable sovereign immunity when it consented to the exclusive venue and jurisdiction of this Court to resolve disputes between the parties.

7. This Court has personal jurisdiction over Sierra Leone under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

8. Venue is proper in the United States District Court of the District of Columbia pursuant to 28 U.S.C. § 1391(f)(4) because this suit is brought against a foreign state and its political subdivisions, and Congress intended to make this District a venue for all suits brought against sovereign states not immune from suit.

Facts

*The Underlying Dispute*

9. Jenner & Block's claims arise from its representation of the Republic in an underlying dispute with its iron ore mining concessionaire Gerald International Ltd. and its affiliates ("Gerald").

10. In 2019, Sierra Leone was party to a concession contract with Gerald under which, among other things, Gerald was permitted to remove iron ore from mines located in the Republic and sell that ore in exchange for a commission paid to the Republic.

11. In early 2019, the Republic asserted that Gerald was in breach of various provisions of the concession agreement and took certain actions against Gerald, including issuing an order preventing Gerald from removing or selling any additional iron ore.

12. In response, Gerald commenced three proceedings against the Republic, including: (a) an arbitration before a tribunal convened under the International Court of Arbitration of the

International Chamber of Commerce ("ICC"); (b) an investment treaty arbitration before a tribunal convened under the International Centre of the Settlement of Investment Disputes ("ICSID"); and (c) an arbitral enforcement proceeding before the United States District Court for the District of Columbia (collectively, the "Concession Proceedings").

13. Among other things, in the Concession Proceedings, Gerald sought to compel Sierra Leone to rescind the cancellation of the concession and lift its order preventing Gerald from continuing its exports of iron ore from the Republic, or alternatively, damages for breach of the concession contract exceeding $1.8 billion dollars (including the net present value of future profits under the concession contract).

14. The Concession Proceedings posed considerable risks to Sierra Leone and presented unusually complex issues of fact and law to defend them.

15. Among other things, Sierra Leone's defenses included assertions that required a detailed forensic investigation and analysis of Gerard's business practices, accounting tactics, and affiliates.

16. Consequently, while the Republic was initially represented by its own officials and local counsel in the Concession Proceedings, it soon determined that it required legal representation by lawyers with experience in the complex issues in the case.

### *Sierra Leone Engages Jenner & Block And Signs The Engagement Letter*

17. On December 3, 2019, after an arms-length negotiation, the Republic retained Jenner & Block to represent it in the Concession Proceedings—which were already underway—under a written agreement, the "Engagement Letter," attached as Exhibit A.

18. The Engagement Letter contained three provisions relevant to the parties' current dispute.

19. First, the Engagement Letter provided that Sierra Leone would pay Jenner & Block for its representation a flat fee of $1,500,000 "per year for [Jenner's] services . . . in quarterly installments of 375,000 USD per quarter until the termination of proceedings in the collective Matters, with the first payment commencing on January 2020." *Id.* Sierra Leone "agree[d] to pay the invoices for Jenner & Block's charges within thirty (30) days of the date on which the statement was sent to [it]."

20. Second, the Engagement Letter contained a provision selecting the law of the District of Columbia to govern their disputes: the parties agreed that the Engagement Letter "shall be governed by and interpreted in accordance with the laws of the District of Columbia in the United States, without giving effect to the choice of law provisions thereof."

21. Third, the parties agreed and consented to the exclusive venue and jurisdiction of this Court to resolve their disputes: "The United States District Court for the District of Columbia and the appropriate courts of the District of Columbia shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the engagement and any matter arising from it." *Id.* The Parties further agreed to "submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction."

### *The Unanticipated Course Of The Concession Proceedings And The Republic's Promises To Pay For Out-Of-Scope Work*

22. Jenner & Block represented Sierra Leone in the Concession Proceedings, as well as an additional proceeding brought in the English courts also arising out of the same facts, from December 2019 through October 2021.

23. Jenner & Block's work in defending the Republic in the Concession Proceedings turned out to be far more complex and voluminous than either party initially contemplated for three primary reasons.

24. First, before Jenner & Block entered its appearance, and during the period in which Sierra Leone was represented by its own officials, the ICC tribunal had already granted Gerald urgent interim relief, requiring the Republic to permit Gerald to resume iron ore exports.

25. However, the Republic determined that it would not obey the ICC tribunal's interim order, a determination which greatly multiplied the nature of the proceedings and required Jenner & Block to undertake significant additional work.

26. Second, the Engagement Letter's fixed fee was founded on the mutual understanding that the Concession Proceedings would follow the usual course of ICC and ICSID matters, but they did not.

27. Instead, Gerald followed a litigation strategy that greatly multiplied the necessary work and fees, by initiating numerous applications and petitions—often relating to actions taken by Sierra Leone outside the Concession Proceedings—that were unexpected and not usual and customary in similar proceedings.

28. For example, in late 2019 and 2020 alone, initially uncontemplated work was required to respond to 12 applications or requests (similar to motions or petitions) relating to interim and ancillary matters, not the ultimate merits, filed by Gerald:

    a. Request for Interim Measures filed on November 1, 2019;

    b. Submission re Power to Impose Penalties filed on November 12, 2019;

    c. Request for Interim Measures filed on December 3, 2019;

    d. Request for Undertakings filed on January 31, 2020;

  e. Application for Interim Measures filed on February 10, 2020;

  f. Request for Temporary Interim Measures filed on May 15, 2020;

  g. Update For Tribunal On Arrests And Request For Temporary Interim Relief Pending Application For Interim Measures filed on May 21, 2020;

  h. Request for Penalties filed on June 26, 2020;

  i. Request for Leave to Disclose filed on July 6, 2020;

  j. Application for Unless Order filed on October 16, 2020;

  k. Application for Disclosure and Penalties filed on January 14, 2021; and

  l. Application for Production of Handwriting Expert's Report filed on March 2, 2021.

  29. A number of these applications arose as a result of actions alleged to have been taken by Sierra Leone, outside and notwithstanding the Concession Proceedings, including the arrest of Gerald employees and the alleged misuse of criminal investigative powers and, in particular, multiple allegations by Gerald of attempts by Sierra Leone to replace it and/or sell the iron ore mines during the pendency of the Concession Proceedings.

  30. Third, in response to Gerald's claims, the Republic instructed Jenner & Block to aggressively pursue certain matters ancillary to the merits, such as a jurisdictional challenge and asserting and litigating the potential bias of an emergency arbitrator appointed by ICC. These additional pursuits, and the scorched-earth approach taken by Gerald, required Jenner & Block to draft enormous briefings, which greatly increased the scope of work and amount of hours Jenner & Block was required to work.

  31. Beginning as early as August 8, 2020, Jenner & Block promptly and repeatedly communicated to authorized representatives of the Republic, including directly to its chief executive, the President, that the scope of work in the Concession Proceedings exceeded the

magnitude of work contemplated by the Engagement Letter, and that in order to continue to represent the Republic, Jenner & Block would require additional compensation.

32. In response, authorized representatives of Sierra Leone repeatedly acknowledged that additional payments were required and appropriate, requested that Jenner & Block continue its work, and agreed to address Jenner & Block's compensation needs.

33. Charlie Lightfoot is a Jenner & Block partner who became in charge of the Concession Proceedings in Spring 2020.

34. Over the course of Jenner & Block's representation of Sierra Leone in the Concession Proceedings, Mr. Lightfoot regularly conferred with Osman Kanu, Senior Counsel to the Attorney General, and Julius Mattai, Director General of the National Minerals Agency, in reaching decisions regarding litigation strategy and payment. From time to time, Mr. Lightfoot conferred directly with then Attorneys General Priscilla Schwartz and Anthony Brewah and with the Minister of Mines and Mineral Resources Timothy Kabba in receiving instructions and discussing payment of fees.

35. Throughout these communications, the representatives of Sierra Leone repeatedly acknowledged that the Concession Proceedings were more complex and costly than originally anticipated, that the Republic desired Jenner & Block to continue its representation, and that Jenner & Block's additional fees would be addressed.

36. In addition, the chief executive of the Republic himself, President Julius Maada Wonie Bio (with whom representatives of Jenner & Block had previously discussed the Concession Proceedings in person), personally assured Mr. Lightfoot in a meeting on October 5, 2020 that Jenner & Block's fees would be addressed.

37. During that October 5, 2020 meeting, Mr. Lightfoot met personally with President Bio (among others) in person to provide an update on the status and merits of the Concession Proceedings and discuss the level and payment of Jenner & Block's fees.

38. Mr. Lightfoot reiterated during that October 5, 2020 meeting that, as previously discussed with various representative of Sierra Leone, due to the unforeseeable level of complexity and the actions of Gerald in the Concession Proceedings, Jenner & Block's fees were much higher than envisioned by the flat fee in the Engagement Letter, and that to continue, Jenner & Block would need additional compensation to cover the true expense of defending Sierra Leone.

39. In response, at the meeting, President Bio stated that the Republic desired Jenner & Block to continue with its work and that its fees would be addressed.

40. In addition to these regular communications, by its performance, the Republic expressly acknowledged that the flat fee in the Engagement letter was insufficient given the expansion in Jenner & Block's scope of work and made five additional payments.

41. On August 26, 2020, Jenner & Block invoiced the Republic $500,000 in fees for two English court applications that were not part of the original Concession Proceedings; Sierra Leone paid that invoice on February 12, 2021.

42. On November 23, 2020, Jenner & Block invoiced the Republic $400,000 for "Capped Fee Work Conducted Outside The Scope Of The Quarterly Fees During First Four Quarters"; Sierra Leone paid that invoice on February 12, 2021.

43. On March 5, 2021, Jenner & Block invoiced the Republic $100,000 in fees that were beyond the scope of the Engagement Letter; Sierra Leone paid that invoice on October 6, 2021.

44. On March 19, 2021, Jenner & Block invoiced the Republic $100,000 in fees that were beyond the scope of the Engagement Letter; Sierra Leone paid that invoice on October 27, 2021.

45. On or about December 20, 2021, Jenner & Block invoiced the Republic $250,000 for fees that were beyond the scope of the Engagement Letter; Sierra Leone authorized Jenner & Block to satisfy that invoice by taking into income $250,000 that Jenner & Block held in its client trust account.

46. These 5 occasions when Sierra Leone paid Jenner & Block certain monies above and beyond the Engagement Letter's fixed fees demonstrate that Sierra Leone understood and agreed that Jenner & Block required additional compensation to continue with the representation.

47. Ultimately, in June 2021, as a direct result of Jenner & Block's vigorous and tireless representation of Sierra Leone, the Republic reached a highly advantageous settlement in principle with Gerald.

48. That settlement resolved Gerald's $1.8 billion damages claim against Sierra Leone without any payment of any kind by the Republic to Gerald.

49. The settlement also required Gerald to implement a series of additional procedures to address the issues that had caused the Republic to suspend Gerald's exports in the first place.

50. The settlement also called for the sale of iron ore that had been stockpiled during the Concession Proceedings and the payment of commissions to the Republic out of that sale.

51. On or about May 11, 2021, Sierra Leone's Attorney General Brewah stated to Mr. Lightfoot that "payment of your legal [services] w[ould] be address[ed] in due course" as part of the settlement process, and that Jenner & Block's out-of-scope fees could be satisfied out of the proceeds of the stockpile sales called for by the settlement.

52. The last of the Concession Proceedings was dismissed in October 2021. The ICC and ISCID proceedings were subsequently stayed in May 2021 and discontinued in January 2022.

53. On dozens of occasions between August 2020 and October 2021, both in writing and orally, Mr. Lightfoot raised the need for additional compensation for Jenner & Block's out-of-scope work with the highest levels of the government of the Republic, including the President, Attorney General, Minister of Mines and Director General of the National Minerals Agency; each time, Jenner & Block was asked to continue its work and assured that its need for additional fees to match the actual work required would be addressed in due course.

54. Jenner & Block directly relied on those express assurances in continuing work in the Concession Proceedings from as early as August 2020, after it became apparent that the initial flat fee would grossly undercompensate Jenner & Block for its work.

55. Sierra Leone was highly satisfied with Jenner & Block's work and has never raised any concern about the result it obtained or the quality of that work, the necessity of any of the work Jenner & Block performed, or the efficiency of its work.

### *Sierra Leone Acknowledges Its Debt But Fails To Pay Amounts Due*

56. Due to the unanticipated course of the Concession Proceedings and the Republic's request that Jenner & Block pursue additional avenues, Jenner & Block incurred approximately $11.7 million in fees.

57. Because the Concession Proceedings occurred during two calendar years, the fixed fee required by the Engagement Letter was a total of $3 million ($1.5 million annually times 2).

58. Jenner & Block expended an additional approximate $8.7 million in out-of-scope fees (the "Out-Of-Scope Fee Delta").

59. To date, the Republic has paid Jenner & Block fees of only approximately $3.6 million. Those payments consisted of:

   a. Payment of $2.25 million of the owed fixed fee under the Engagement Letter, leaving $750,000 due (the "Fixed Fee Due").

   b. Payment of $500,000 owed for the out-of-scope work in the English courts.

   c. Payment of $400,000 owed for other out-of-scope work in the first part of 2020.

   d. Partial payments of $450,000 for additional out-of-scope work in 2021.

60. Consequently, Jenner & Block is owed a total of $8.1 million, consisting of the Fixed Fee Due of $750,000 plus the unpaid portion of the Out-Of-Scope Fee Delta of $7.35 million (consisting of the total delta of $8.7 million less the above aggregate payments of $1.35 million ($500,000 plus $400,000 plus $450,000)).

61. Mr. Lightfoot, on behalf of Jenner & Block, has made dozens of requests for payment during 2021 and 2022, directed at various members of the government of the Republic, including Dr. Kanu, Mr. Mattai, and Mr. Brewah.

62. Sierra Leone has never disputed, and has affirmatively acknowledged, that Sierra Leone owes Jenner & Block additional fees.

63. However, Mr. Lightfoot has been advised that payment of Jenner & Block's fees will require approval by Sierra Leone's government Cabinet.

64. During May through July 2021, Mr. Lightfoot worked with Dr. Kanu to attempt to obtain the required approvals for additional payment.

65. In that time period, Jenner & Block proposed a final payment to address the unpaid Out-Of-Scope Fee Delta of $6 million, an amount that would continue to reflect a substantial discount on the total fees Jenner & Block incurred.

66. In that same time period, Mr. Lightfoot had various conversations with Sierra Leone representatives, including Attorney General Brewah, who indicated that the proposal was acceptable and would be placed before Cabinet for approval.

67. In July 2021, with Dr. Kanu's assistance, Mr. Lightfoot drafted a resolution for the Cabinet's approval that would authorize a $6 million payment to Jenner & Block as full payment of outstanding fees.

68. After submitting that resolution, Jenner & Block continued to work for and receive assurances from Sierra Leone representatives that approval of the proposal was forthcoming:

   a. On August 27, 2021, Dr. Kanu stated to Mr. Lightfoot that payment for out-of-scope work was forthcoming, and that Dr. Kanu believed payments would be authorized by President Bio within the next week.

   b. On September 6, 2021, Dr. Kanu again stated to Mr. Lightfoot that he had provided the Ministry of Finance with clarification and that payments would be made that week.

69. Sierra Leone continued to fail to make the promised payments for out-of-scope work.

70. On September 29, 2021 and October 28, 2021, Mr. Lightfoot emailed Dr. Kanu asking for immediate confirmation that both Jenner & Block's outstanding invoices and the out-of-scope work would be duly compensated.

71. On information and belief, the resolution authorizing payment to Jenner & Block has never been presented to the Republic's Cabinet for decision, despite repeated assurances that it would be.

72. Mr. Lightfoot has made numerous additional requests for payment during 2022.

73. Dr. Kanu has continued to acknowledge that Jenner & Block is owed its fees, and should be paid, but the Republic has failed to take any action to pay Jenner & Block.

74. On August 19, 2022, Jenner & Block's General Counsel, Robert Stauffer, sent a letter to the Republic's Attorney General and Minister of Justice, Minister of Mines and Mineral Resources, and Director General of the National Minerals Agency, demanding payment of the outstanding amounts and threatening legal action if payment was not made.

75. On November 11, 2022, Mr. Stauffer sent a final demand letter, attaching a copy of a draft of this complaint, to the same officials of the Republic.

76. Jenner & Block has received no further payment since December 2021, and Mr. Stauffer's letter has received no formal response.

77. Consequently, and regrettably, although there is no dispute that Jenner & Block is owed its fees, the Republic's long-term inaction requires Jenner & Block to take this legal action to compel the Republic to address its debt.

## CLAIMS FOR RELIEF

### COUNT I
**BREACH OF CONTRACT – FAILURE TO PAY LEGAL FEES PURSUANT TO ENGAGEMENT LETTER**

78. Jenner & Block incorporates by reference and realleges each of the allegations contained in paragraphs 1-77 of this Complaint.

79. The Engagement Letter is a binding and enforceable contract.

80. Jenner & Block fully performed its obligations and satisfied all conditions under the contract, providing exceptional legal services that resulted in legal victories and a highly favorable result for the Republic.

81. The Engagement Letter required the Republic to pay $1.5 million each year the Concession Proceedings were pending, and they were pending for two years, requiring a total fixed fee payment of $3 million.

82. The Republic has paid only $2.25 million of the $3 million due, leaving $750,000 outstanding far past the 30-day payment terms required in the Engagement Letter.

83. The Republic's breach has damaged Jenner & Block in the amount of $750,000.

## COUNT II
### BREACH OF CONTRACT – FAILURE TO PAY LEGAL FEES PURSUANT TO ORAL AGREEMENT

84. Plaintiff Jenner & Block incorporates by reference and realleges each of the allegations contained in paragraphs 1-77 of this Complaint.

85. A few months into Jenner & Block's engagement, in Spring 2020, when it became clear that the scope of its representation would far exceed the fixed-fee agreement, Jenner & Block approached Sierra Leone about modifying the fixed-fee agreement to cover out-of-scope work.

86. Sierra Leone was pleased with Jenner & Block's representation and stated that it desired Jenner & Block to continue its work and perform additional out of scope work.

87. Authorized representatives of Sierra Leone orally agreed to pay Jenner & Block additional compensation for out-of-scope work, and Jenner & Block relied on this agreement in continuing to represent the Republic for the remainder of 2020 and during 2021.

88. Sierra Leone confirmed this oral agreement by its conduct and performance when it made a total of five additional payments in exchange for out-of-scope work.

89. The oral agreement to pay Jenner & Block is a valid oral agreement formed after an offer by Jenner & Block to continue work for more fees, acceptance by the Republic in asking Jenner & Block to continue with the understanding it would receive additional compensation, and consideration (further legal representation for more fees).

90. The oral agreement requires Sierra Leone to pay the remaining Out-Of-Scope Fee Delta of $7.35 million, but Sierra Leone has not done so.

91. Sierra Leone's breach has caused Jenner & Block damage in the amount of $7.35 million.

## COUNT III
### ALTERNATIVE COUNT: BREACH OF IMPLIED CONTRACT – *QUANTUM MERUIT*

92. Plaintiff Jenner & Block incorporates by reference and realleges each of the allegations contained in paragraphs 1-77 of this Complaint.

93. Even if the Court were to hold that there was no express contract between Jenner & Block and Sierra Leone as alleged in Count II, there was a contract implied-in-fact.

94. By providing out-of-scope legal services work described above, Jenner & Block rendered valuable services to Sierra Leone, which Sierra Leone accepted with full knowledge—and indeed with its open and repeated acknowledgment—that Jenner & Block expected and was entitled to be paid the $7.35 million for out-of-scope work.

95. By failing to compensate Jenner & Block for its out-of-scope work, Sierra Leone was and remains in breach of the implied-in-fact contract according to which Jenner & Block was to provide out-of-scope services and the Republic was to pay for that work.

96. Pursuant to the terms of agreements between Sierra Leone and Jenner & Block, Sierra Leone is now indebted to Jenner & Block the amount of $7.35 million.

## COUNT IV
### ALTERNATIVE COUNT: BREACH OF IMPLIED CONTRACT – UNJUST ENRICHMENT

97. Plaintiff Jenner & Block incorporates by reference and realleges each of the allegations contained in paragraphs 1-77 of this Complaint.

98. Even if the Court were to hold that there was no express contract between Jenner & Block and Sierra Leone as alleged in Count II, there was a contract implied-in-fact because permitting Sierra Leone to retain the benefits provided by Jenner & Block without compensation would be unjust and inequitable.

99. At all relevant times, Jenner & Block made clear to Sierra Leone that it expected compensation for the out-of-scope work for the legal services Jenner & Block provided on the Republic's express instruction to perform this out-of-scope work.

100. Sierra Leone benefitted from Jenner & Block's legal representation and continued to benefit from them to this day as Jenner & Block secured many legal victories for the Republic.

101. Unless Jenner & Block is compensated for those benefits, Sierra Leone's retention of its benefits without compensation to Jenner & Block is unjust.

102. Sierra Leone repeatedly acknowledged its obligation to pay for services provided by Jenner & Block, offering excuses for delays in payments but not disputing the sum of legal payment Jenner & Block claimed are due.

103. Without the intervention of this Court, Sierra Leone will have been unjustly enriched in the aggregate amount of $7.35 million.

## COUNT V
### ALTERNATIVE COUNT: BREACH OF IMPLIED CONTRACT – PROMISSORY ESTOPPEL

104. Plaintiff Jenner & Block incorporates by reference and realleges each of the allegations contained in paragraphs 1-77 of this Complaint.

105. Even if the Court were to hold that there was no express contract between Jenner & Block and Sierra Leone as alleged in Count II, the Court should still enforce the promise as Jenner & Block detrimentally relied on Sierra Leone's promises to pay.

106. A few months into the engagement, Jenner & Block informed Sierra Leone that Jenner & Block's legal representation far exceeded the original scope of the Engagement Letter, and that Jenner & Block would require additional compensation for this out-of-scope work in order to continue its representation.

107. At all relevant times, authorized representatives of the Republic assured Jenner & Block that it would be compensated for the out-of-scope work—repeatedly instructing Jenner & Block to continue its representation when Jenner & Block made clear that would require additional compensation for out-of-scope compensation.

108. Jenner & Block detrimentally relied on Sierra Leone's promises, incurring substantial legal fees as it continued to zealously advocate for the Republic and secure legal victories, without receiving compensation for Jenner & Block's representation.

109. Without the intervention of this Court, therefore, Jenner & Block will fail to receive compensation due it in the aggregate amount of $7.35 million.

## PRAYER FOR RELIEF

WHEREFORE, Jenner & Block respectfully requests this Court grant the following relief:

1. ACCEPT jurisdiction over the subject matter of this Action, and personal jurisdiction over Sierra Leone, denying any claim of immunity that may be asserted;

2. AJUDGE that Sierra Leone is in breach of the express written contract regarding outstanding invoices, awarding to Jenner & Block contract damages in the amount of $750,000;

3. AJDUDGE that Sierra Leone is in breach of an oral contract to compensate Jenner & Block for out-of-scope work, awarding Jenner & Block contract damages in the amount of $7.35 million;

4. In the alternative, ADJUDGE that Sierra Leone is in breach of its implied-in-fact contract with Jenner & Block, awarding to Jenner & Block contract damages in the amount of $7.35 million;

5. In the alternative, ADJUDGE that permitting Sierra Leone to retain the value of the services provided to it by Jenner & Block would be unjust and inequitable, awarding to Jenner & Block restitution in the amount of $7.35 million;

6. In the further alternative, ADJUDGE that Sierra Leone induced Jenner & Block's detrimental reliance on the Republic's promises to pay, awarding to Jenner & Block restitution in the amount of $7.35 million;

7. AWARD to Jenner & Block pre-judgment interest, as from each of the unpaid invoices delivered by Jenner & Block and the unpaid out-of-scope legal fees;

8. AWARD to Jenner & Block the costs of the litigation, including reasonable attorneys' fees; and

9. GRANT such additional relief as the Court shall appear just and equitable.

JENNER & BLOCK DEMANDS A TRIAL BY JURY ON ALL COUNTS TO WHICH IT IS SO ENTITLED CONSISTENT WITH THE JURISDICTION OF THIS COURT.

Dated: November 29, 2022

Respectfully submitted,

JENNER & BLOCK LLP

*/s/* Kali N. Bracey

Kali N. Bracey
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone: 202 639-6000
Fax: 202 639-6066

David Jimenez-Ekman (pro hac vice pending)
Maria C. Gonzalez (pro hac vice pending)
353 N. Clark Street
Chicago, Illinois 60654-3456
Phone: 312 222-9350

*Attorneys for Jenner & Block*